**PDS & W, A Partnership, George Snyder, Individually, and Darrell Davis, Individually, Appellants,**

v.

**ELCOR CORPORATION, Appellee.**

No. 08-87-00330-CV.

Court of Appeals of Texas, El Paso.

July 20, 1988.

Christopher F. Johnston, Jeffrey T. Weikert, Studdard, Melby, Schwartz, Parrish & Maxfield, El Paso, for appellants.

Elizabeth M. Marsh, Randall Lundy, Lynch, Chappell, Allday and Alsup, Midland, for appellee.

Before OSBORNE, C.J., and SCHULTE and WOODARD, JJ.

## OPINION

SCHULTE, Justice.

This represents a breach of contract action brought by Elcor Corporation against Appellants and a deceptive trade practices counterclaim by Appellants concerning equipment purchased on an "as is, where is," basis, by Appellants from Appellee. The surnames of the partners were Poyner, Davis, Snyder and Wilkes. The jury set damages for Appellee at $50,000.00 plus attorney's fees. Appellants purchased equipment from Elcor's Rockhouse Plant Facility, the "reactor tower" under a 1981 auction agreement, and the "sulfur plant" under a 1985 contract. Appellants refused to perform and to tender the contract money when they discovered asbestos in the equipment and countersued regarding the 1981 auction purchase. We affirm.

Special Issue No. Seven asked the jury whether they found from a preponderance of the evidence that the mistake concerning the presence of asbestos was a material part of the 1981 auction agreement and/or the 1985 contract. The charge placed the burden on Appellants to obtain affirmative answers to the questions, as to the 1981 auction and/or the 1985 contract. The jury answered "no" to both parts.

In response to prior questions regarding both the 1981 and 1985 transactions, the jury found that Elcor did not knowingly fail to disclose the asbestos and that there was a mutual mistake of fact about the presence of asbestos at the Elcor facility. The court instructed the jury in connection with question No. Seven, as follows:

A material mistake of fact must involve the subject matter of the contract and the substance thereof. It may not be related to a mere collateral matter. It must be a mistake of fact, but for the mistake of fact, a party would not have assumed the obligations of the contract.

The Supreme Court has recently stated that there is no distinction between a review of findings and a review of non-findings. *Cropper v. Caterpillar Tractor Company*, 31 Tex.Sup.Ct.J. 459 (May 28, 1988).

Appellants' assail the trial court's denial of their motion for a new trial because they contend the opposite of the jury's answer to Special Issue No. Seven was established as a matter of law and/or that the answer was so against the great weight and preponderance of the evidence as to be manifestly unjust. We are asked to reverse and render or, alternatively, remand. We will afford Appellants' points, a reading in accordance with Tex.R.App.P. 74(d), consistent with the authorities hereinafter cited.

As the Court stated in pertinent part *in Herbert v. Herbert*, 31 Tex.Sup.Ct.J. 453 (May 28, 1988):

[A]ppellate courts are not free to substitute their judgment for that of the jury

simply because they may disagree with the jury's verdict. We additionally would remind that in considering great weight points complaining of a jury's failure to find a fact, courts of appeals should be mindful that a jury was not convinced by a preponderance of evidence. Therefore, in such instances, courts of appeals are not entitled to reverse merely because they conclude that the evidence preponderates toward an affirmative answer. Reversal would be warranted only after a detailing of evidence under the *Pool* criteria indicates that the *great* weight of that evidence supports an affirmative answer.

Following that principle, we have reviewed all of the evidence keeping also in mind the standard set forth in *Herbert*, 31 Tex.Sup.Ct.J at 455, (May 28, 1988), that is, whether the verdict is clearly contrary to the evidence. The *Pool* case cited in *Herbert* is *Pool v. Ford Motor Co.*, 715 S.W.2d 629, (Tex.1986).

Appellee presented evidence that Appellants' primary inducement was low price and profit on resale; that Steve Poyner would have made the purchase regardless of asbestos; that the "sulfur plant" contained no asbestos; that a buyer was found by Dewey Sage in spite of the asbestos; that Appellants had ample opportunity to inspect the equipment for a week before the auction, and for four years before the contract, and that one of the Appellant partners was well aware of the equipment and had lived on the facility and ranched on adjacent property. Appellees further stress evidence showing that the transactions were "as is, where is" sales without warranty. On the other hand, Appellants rely on evidence that two of the partners testified they would not have bought the equipment if they had known of the asbestos; that Appellee would not have sold it with that knowledge; that Poyner's testimony that Appellees would have bought the equipment any way is irrelevant, since Poyner was not a partner part of the time; that the piping of the "sulfur plant" did contain asbestos; and that in regard to the assertion, the equipment could have been sold even with the asbestos; Dewey Sage

was not acting as the agent of Appellants. Appellants agree that there was ample opportunity to inspect, manifesting Appellees were in a better position to know of the asbestos, and did not. Appellants further argue that voluminous federal legislation relating to asbestos "buttresses" the claim asbestos was material.

As to the 1981 auction sale, condition of sale number five provided:

> Everything listed will be sold as is— where is and becomes buyer's responsibility when the sale is made. We believe the descriptions are accurate, but you buy what you see without warranty.

Paragraph nine of the 1985 contract was entitled "[d]isclaimer of [w]aranties" [sic] and provided in pertinent part that:

> IT IS UNDERSTOOD THAT THE PROPERTY IS BEING SOLD ... "AS IS," THAT THERE ARE NO EXPRESS OR IMPLIED WARRANTIES ... OR ANY IMPLIED WARRANTY THAT THE PROPERTY SHALL BE FIT FOR ANY PARTICULAR PURPOSE OR THAT IT SHALL BE MERCHANTABLE ...

To effect the 1981 auction purchase, Appellants made a bank loan initially for $80,-000.00. At the time of trial, the week of August 3, 1987, Appellants owed the bank $98,000.00 including interest. No part of the $50,000.00 purchase price was ever paid Appellee under the 1985 contract.

Appellant Davis had gone to the auction at the Holiday Inn with Steve Poyner. Steve Poyner was a partner of PDS & W for a time. They sat with Snyder and Wilkes, two others who were to be in the partnership. Davis candidly admitted in regard to the auction that he knew the sale was "as is, where is," glibly stating in part:

> They can't guarantee a valve that's 18 years old. You know, it's as is, where it is. You pick it up and haul it off."

As to the group's $49,000.00 successful auction bid on the 220 foot high reactor tower, Davis testified:

> We just thought that would be a heck of a deal. We decided how high we would bid on it and we went after it.

The jury heard Davis further testify that when they went out to claim their purchase, "when we got out there, we found out 40 other people had bid on stuff on this reactor. Being kind of dumb, we thought we had bought the whole damned thing, but we didn't." Later he said that with the great many people running around on the site, "we didn't have any business out there with somebody up on the reactor throwing stuff off. We just kind of backed off for a little bit and caught our breath."

It appears that the partners "backed off" for about four years, leaving the tower essentially in place and paying some interest on the loan to the bank. Snyder testified the partnership in 1985 went to Elcor and initiated the purchase of the sulfur plant for $50,000.00, agreeing on cross-examination that he was pleased with the price, "because you knew it was a real steal under the circumstances." Both Snyder and Davis denied knowledge of any asbestos and said they would not have made either deal if they had known. Poyner, a partner as to the 1981 reactor buy, on the other hand, said he did not know about the asbestos but if he had known, "I wouldn't have had any problem with it."

Cisneros, the original insulation contractor, testified in part with regard to the sulfur plant:

The insulation ... was mineral wool, and now we know that mineral wool never has had any asbestos in it.

Rosebery, an engineer and vice-president of Elcor, denied any knowledge of asbestos before Snyder asked to buy the sulfur plant in 1985. He did testify that if "there had been a known health problem there, we certainly would have [informed bidders] or we might not have even sold the equipment." Laengrich, a chemical engineer, connected with Elcor, said he was not earlier aware of asbestos in any "significant amount." He did know there were certain gaskets that had asbestos. Moncrief, a civil engineer, also connected with Elcor, testified the first time he knew of asbestos at the plant was "last year." [1986]. He expressed surprise.

Scott Edge, an asbestos abatement contractor, testified he had told Snyder the asbestos could be removed and did not say it was impossible. There was other evidence that the cost of removal could have been from $25,000.00 to $100,000.00. Snyder denied he was "delighted" to learn of the asbestos or that it was going to be so expensive they could not handle it. Davis did testify that en route to pay Rosebery the $50,000.00 for the 1985 contract, they had "found out that there could be a situation out there that was way over the scope of our head...." The money was not paid.

On rebuttal, Elcor read to the jury from the deposition of Davis:

Q. Okay. What was your and Mr. Snyder's interest in the reactor at the offset?

A. Well, we didn't have an interest in it until we found out they was [sic] giving it away, you know. We're kind of gamblers, so we kind of gambled.

Q. So you got a good deal on the reactor?

A. We thought we got an exceptional deal, we thought.

In any event, the jury heard the evidence extracted above and much more over the period of the four day trial. It would appear that Issue No. Seven was a most appropriate one for resolution by the jury.

The evidence before us precludes a determination that the verdict is clearly contrary to the evidence. Nor do we determine that the great weight of the evidence supports an affirmative answer to Special Issue No. Seven. Even were we to disagree with the jury's verdict, as Appellants do, we may not substitute our judgment for that of the jury. We are mindful that the jury was not convinced by a preponderance of the evidence. Appellants' points of error are overruled.

The judgment is affirmed.